The Court now calls Cases 119-618, 620-638, 639-644, consolidated. Mary J. Jones et al. v. Municipal Employees' Annuity & Benefit Fund of Chicago et al. Appellants ready? Ready, Your Honor. Appellees ready? Ready, Your Honor. Proceed. Good morning. My name is T. Patton on behalf of the City. Before you begin, since you've split arguments on both sides, I just want to make sure you understand you're responsible for keeping track of your own time. I am, Your Honor, and thank you. I will be using 15 minutes and the funds will be using five. Excuse me. Go ahead. May it please the Court, this appeal hinges on two facts, neither of which is disputed. First, without the Act, the funds will become insolvent in a matter of years. Second, the Act avoids this looming disaster for the funds and their participants by massively increasing the City's contributions and imposing a new obligation that the City must pay each year whatever amount the fund's actuaries determine is necessary to ensure that the funds are fully funded and that all pensions will be paid. Excuse me. This case thus presents an issue that was not before this Court in the pension reform case, and that is whether a pension statute that overwhelmingly benefits fund participants through a massive increase in the City's contributions that not only saves the funds from insolvency but ensures that they will be fully funded over time, nevertheless diminishes or impairs pensions and thereby violates the clause because the Act also imposes modest reductions in future automatic annual increases. Now, in pension reform, the statute did not impose a new funding obligation, let alone one that saved the funds there from insolvency. It simply reduced benefits. And the State conceded. The Act as a whole, in fact, did diminish or impair pensions, and the only question there was whether that conceded impairment was nevertheless justified by the State's exercise of its police power. This case is unique. It is different because the Act here overwhelmingly benefits fund participants and avoids insolvency. It does not diminish or impair pensions under the plain language of the pension clause. Membership in any pension or retirement system shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired. Here, the benefits of membership in these funds is not diminished or impaired. They are preserved and protected. Now, those facts distinguish this case not only from the pension reform case, but every prior Illinois case where pension modifications were struck down. In each, the General Assembly had simply reduced pensions or rights that had previously been given. None of those cases involved legislation that imposes substantial new funding obligation, let alone one that saved the fund from insolvency and resulted in a substantial net benefit to participants. I want to mention- Counsel, how does the promise of actual sound funding, how does that matter when the Constitution guarantees that the employee benefits that they were promised they'll get? I mean, to say, hey, you're getting these benefits, you're promised these benefits, and now we're going to promise again to fund it so you get these benefits, how is that a plus? Because, as this Court made clear in the three funding cases, and as plaintiffs certainly concede, the Constitution did not guarantee or require funding. It tried, and plaintiffs rely heavily on this, to, by protecting benefits, to prompt the General Assembly to step forward, but it didn't require that. I turn that question around. What use is a benefit unless the money is there to pay it, Your Honor? And here, it's indisputed that the pension contract that these participants entered into always included a provision, Section 22403, that was part of the pension contract that provided that for these funds, the funds alone are obligated, not the city and not any other entity. This Act steps up, and in this Act, the city steps up and assumes an obligation it never had before, and one that indisputedly would not only save these funds from otherwise certain insolvency in a matter of years, but completely reverse course and ensure that they're fully funded over time. May I ask a question following up on Justice Thomas, and specifically focusing on the statutory provision that you just indicated. When this Court has talked about the protections of the Constitution, it has always gone back and looked at the language and the debates at the Constitutional Convention, and this Court has often recognized that the framers were very clear that they would not, this Pension Protection Clause would not control funding. Rather, the purpose of the clause was to ensure public employees receive their promised benefits. Now, you point us to the statute that was adopted before the Constitution, and you argue that, in fact, there has never been an obligation to pay for those benefits. How do you reconcile those very different ideas? Yeah, I did say there was not an obligation to pay for the benefits. The question is, who's on the hook to pay for those benefits? There's an obligation to pay, and under the pension contract here, that obligation to pay was limited to the funds. And what this Act does is it not only specifies the who but the what, and for the first time it creates a backstop that, yes, the city is responsible for paying those benefits, not just the fund, and it is responsible for doing so through an actuarial funding obligation. So as what you're saying, your understanding of these, the Constitution and the statutory provision, you're saying that the constitutional guarantee that promised benefits will be paid is limited by whatever amount there is in the pension fund, and if the pension fund runs out of money, that guarantee no longer applies? No, not necessarily. It depends on the particular pension contract. This Court has held time and time again that the pension clause doesn't create the terms of the pension contract. That's for the General Assembly to do under well-settled principles of separation of powers. What the pension clause does is it protects those rights, those obligations that are fined and limited by the pension code. And I'm saying here, Your Honor, this is not true of most funds in the State. Most funds in the State have express provisions where some entity other than the fund is statutorily obligated to backstop those funds, and many have a further obligation that they have to do so actuarially. That was not part of the pension contract here. So I'm saying that our argument is completely consistent with the language of the clause and well-settled jurisprudence. What the clause does is protects the terms of the pension contract. That's a legislative determination. Here, that legislative determination was prior to the Act that only the funds themselves were responsible for the benefits. Now, the plaintiffs respond to our argument on 22403 by saying that, well, impliedly the clause superseded 22403. Now, they don't cite a case because no case has ever held that. In fact, there's no case that ever has even suggested that 22403 is not good law.  For decades, this Court has held and has enforced pre-1970 terms, pension code provisions, even where they limit or even eliminate entirely pension benefits. In the Kerner case, DeFalco were good examples. And the reason this Court gave for enforcing those even far more draconian provisions than 2403 is because they were part of the pension contract just as much as retirement age or, you know, the defining of the annuity that were part of the contract that's protected by the clause. Now, the second reason why that argument is wrong is not only do we have that general authority specifically enforcing provisions like this pre-1970 that limit or eliminate the payment of pension benefits. We have authority here, including the Goose case, where courts have specifically, post-1970, applied 2403 to decide cases. So 2403 applies here. It's part of the pension contract. And it's why here this is such a unique case and why here we have an act that indisputably leaves these participants better off. It ensures that pension benefits will be paid that otherwise would not be paid. But I want to go further, Your Honor, and say, and even if, okay, and by this I don't mean to concede everything I've said about 22403 because all of it I think is rock solid. But even if you accept all their arguments and assume that 22403 was somehow impliedly over the years overturned, we still win. The statute should still be upheld because participants are immeasurably better off with it than without it. And the proof of that putting is in the fact that the funds, who you'll hear from in a minute, who have a fiduciary obligation to do what's right before the participants, are sitting on our side of this room, not on their side. And 27 of 31 unions are here and have supported this act consistently, including in the General Assembly. But even if you were to find or it were correct that 22403 was overturned, participants are better off because the only alternative the plaintiffs have ever provided for these 75,000 families is maybe, based on dicta in this Court's decision in McNabee and Sklodowski, that maybe when, in this Court's words, these funds are, quote, on the verge of default or end of insolvency, then maybe, and in footnote 3 paragraph 16 of pension reform this Court just a few months ago said, well, we didn't say they could. We just said that we didn't, quote, foreclose the possibility. Maybe they could bring a lawsuit against somebody in the lower court that you wouldn't even say who. They want to keep their options open on some theory. And we don't even know what that is. And maybe they could get a judgment. And maybe they could recover it in time. Of course, by that time, because you wouldn't have billions of dollars being paid in the intervening 10 and 13 years, those unfunded liabilities on a pay-as-you-go basis are going to be far greater. My point, Your Honor, and it's why 27 of 31 unions that we negotiated for two and a half years on this stepped up with us to try to solve this problem is these folks are better off. They will have a pension fund where, you know, in just the first few years, our contributions are going to increase from $177 million in 2014 to more than $650 million and keep going up from there. This is a huge financial obligation. All that money is going to be pouring in these funds, earning returns to ensure that when these folks retire, they won't just have an empty promise, but they will have a fund with billions of dollars in it that will pay their benefits. Now, Counselor, you talk quite a bit about the agreement between the city and the unions. Yes. But you would agree we're dealing with a statute, not a collective bargaining agreement, right? We are. Let me just finish the question and then you can go on. Any agreement between the city and the unions is simply part of the history of how the statute came to be. I think it's more than that, Your Honor, but it is true that in this unique context, and it's quite frankly why collective bargaining really doesn't work here analytically, is we can't determine what pension benefits are. We all knew that when we sat down for two and a half years. We could reach agreement, but we had to come to the General Assembly, and they had to codify that. They had to enact it. But from our standpoint, if the statute is clear and unambiguous on its face, and if we believe, as we're going to hear in a few minutes, how the pension benefits were diminished, why would this Court even consider the Act's history? Well, because an alternative basis, an independent alternative basis for upholding the Act, is to find that it's not unconstitutional because it's a bargain for exchange for consideration, and that picks up on the Crouse case and more recently this Court's decision in Pension Reform footnote 12, where the Court acknowledged that modifications can be made. Certainly, they have to be codified, but modifications could be made through a bargain for exchange for consideration. How could we bind non-consenting members then? You're not saying everybody consented. No, but we're not, and I think that my answer to that would be there's nothing in any case in this state or any place else that would foreclose the Court from applying bargain for consideration here, and plaintiff's argument is to the contrary. There's no case that's rejected bargain for consideration on that basis, plus they would make the consideration approach that this Court has embraced most recently in Pension Reform completely illusory. You're not going to have 75,000 people that probably are going to agree to anything, and the fact that pensions are an individual right that can be individually enforced does not mean that when it comes to what is law for modifying them that this Court can apply a reasonable and common sense approach, as New York has done, where unions can represent their participants and they can do so through a majority vote. And that is a second and independent grounds for affirming the judgment here. Your Honors, I don't want to go past my 15 minutes. I want to make sure my colleagues have a chance to speak. Are there any other questions now? And I look forward to coming back for another 10 at the end. Great. Thank you. May it please the Court, good morning. My name is Vincent Pennelly, and I'm here on behalf of the Municipal Employees Fund, as well as the trustees who are appellants in both the Jones and Johnson matters. The fund has asked this Court to find that the act is constitutional for a very basic reason. By amending Article 8 as it did, the legislature saved the funds from certain insolency. And as you've just heard and have seen in the briefs, that fact is not disputed by any of the parties and is supported by overwhelming evidence in the record that within 10 years, the statutory fixed level of contributions from the active participants, as well as the city, will simply not be enough to pay the full benefits promised to participants. The guarantee of actuarial-based funding from the city that the act contains, however, not only benefits the fund by insulating it from any future economic shocks to its investment portfolio, but for the first time in the history of Article 8, makes the city the responsible guarantor of the payment of money sufficient to pay promised benefits to the participants. This imposition of that obligation on the city is a significant benefit to all of the participants of the fund collectively. By including the right to bring a mandamus action, as well as to intercept and redirect state funds to compel the payment of money owed to the fund, the legislature has now given the fund tools that it did not previously have. Can the future legislature modify those elements of this agreement? I don't think they could. Once they became part of the act, they are now benefits of membership that are protected by the Pension Protection Clause. So by the legislature placing them in Article 8, which is the contract between the city and the employees, they are now protected by the Pension Protection Clause. So the Constitution protects this kind of funding? Yes. And that, I think, was specifically behind the legislature's intent when it passed this act. So returning to those enforcement mechanisms, instead of having to wait until the brink of bankruptcy or default, when it would clearly be too late for the funds to take any action, the funds are now able to immediately take action if there is a deficiency in funding. Simply put, Your Honors, the consequences to the fund of the act being upheld or struck down could not be more stark. With it allowed to stand, the fund will no longer be on this inevitable path to insolvency. It will have guarantees and enforcement mechanisms that will ensure the payment of the promised benefits. Conversely, of course, without the guarantees, we will continue to liquidate 10 percent of our assets every year. We can't in any way invest our way out of this structural imbalance, and our unfunded liability will continue to grow. Under these circumstances, it is imperative that the act is found constitutional. Thank you. Good morning, Your Honors. John Kennedy on behalf of the Laborers Annuity and Benefit Fund of Chicago. We have over 8,000 members that comprise our pensioners, their families, survivors, beneficiaries, active workers, and inactive workers. And that fiduciary obligation means that they are to serve the best interests of all of those members. Your time has expired, Counsel. I'll give you a minute to make a quick statement. Thank you, Your Honor. The bottom line, Judge, is that the act confers retirement security and certainty for the Laborers Fund. The City of Chicago now, for the very first time, will be our guarantor for our funds in perpetuity at actuarial funding levels. That's never happened before. Our Board of Trustees lacks the authority to bail this fund out. It cannot raise taxes, it cannot raise contributions, it cannot levy any funds at all. This act solves those problems. There is a pathway to constitutionality that Counsel has laid out. We urge this Court to reverse the trial court and enter judgment in favor of this act. Thank you, Your Honor. Counsel? May it please the Court. Counsel, my name is John Shapiro. I'm appearing this morning on behalf of the Jones plaintiffs. Mr. Krisloff, who represents the Jauntus plaintiffs, and I have, as the Court knows, agreed to split Appellee's argument this morning. As the Court made clear in May, the General Assembly has no authority to unilaterally diminish pension benefits. There is no dispute that under this act, members of MEADF and LADF, the two funds that just spoke, would receive reduced pensions. So why are we here? Defendants, as you heard, try to rationalize it under two theories. The act provides pension system members some net benefit and therefore is outside the protections of the pension protection clause, and alternatively, if unconstitutional, it was the product of a bargain for exchange, even though no individual pension system member ever partook in any of the negotiations that the city alleges. Neither of those arguments has merits. It's important to keep in mind that these are defined benefits insulated from the political winds that may blow from time to time. So what's really going on here? It's clear. The funding schedule that the General Assembly prescribed for these funds has not matched the funds' obligations. You don't have to take my word for it. As MEADF and LADF, and as the city's actuary admitted, there has been a disconnect. The funding mechanism for employer contributions simply has not matched known fund obligations. Now that the result of that disconnect is intolerable, they just don't want to pay for the benefits. But that's precisely what the pension protection clause precludes. Frankly, this act is little more than an attempt to end run the court's recent confirmation that the pension protection clause lease power cannot be used to justify pension diminishments. The city wants to use monies that would otherwise be contributed to these funds for other services. That's the very rationale for cutting pension benefits that this court rejected earlier this year. So let's examine the net benefit theory for a second. As I said, there's no question under this act, standing alone, the pension benefit reductions couldn't survive constitutional measures. The General Assembly claims it's changed that game by coupling it with those funding diminishments with funding increase. So the question is whether pension diminishments coupled with new funding can shield those benefits. Setting aside money to pay what is already a constitutional guarantee is not a benefit new or net. Funding provisions cannot justify pension benefit reductions in Illinois. That alone should bring an end to the net benefit theory that defendants espouse. But they're undeterred. The city claims that these are unfunded statutory promises and that city retirees will only get their pension benefits if the General Assembly or the city chooses to fund them. But that's the very sort of sophistry by a government employer that the pension protection clause is designed to prevent. After the pension protection clause, how can pension benefits be nothing more than unfunded statutory promises? They can't. They're constitutional obligations. Consider for a moment what the city would have this court rule taken to its logical extension. The city would say and the General Assembly would say that it can accomplish indirectly by simply choosing not to fund these pension benefits, what it can't do directly. In an effort to buoy that theory, defendants contend that this time around the General Assembly really means it. They really intend to require adequate funding. And they point, as you heard, to enforcement mechanisms in the act, but that claim also rings hollow. Consider, for example, the Mandamus action. The funds who are here urging a pension diminishment in light of the pension protection clause have discretion to bring it. But more important, the act would allow the court to change the funding schedule for the pension protection clause. For the very reasons that the General Assembly and the city say that the act is needed in the first place. Because they want to use monies to pay for other services that otherwise would be paid to the pension funds. It's not surprising that you've heard no defendant this morning address that gaping loophole in the so-called guarantee. And it's not surprising that you'll find it addressed nowhere in their briefs. Political football, where is a guarantee, a constitutional guarantee, if the goalpost can always be moved? The act contains no language whatsoever that the legislature here intended to bind all future legislatures to the funding provisions that are included in this act. It's inconsistent with this court's precedent. It doesn't exist. Could the unions bargain for a diminishment of the pension in exchange for some other benefits? These are individual rights, Your Honor, and so these rights, to the extent they could be collectively bargained, that issue isn't present here. As the court itself acknowledged, given the negotiations. But the rights that this court has said are individual pension rights flowing to individual members. As the court recognized earlier this morning, those rights would have to be decided upon by the individual members. So that means that pension clause makes it really impracticable for accrued benefits to be changed, even with other consideration. Is that correct? The statute could be passed that would address options that individuals could choose, but those choices would have to meet notions of fair contracts and choices. As stated, funding plans simply are outside the reach of the pension protection clause. Putting aside money to pay for what already is a constitutionally guaranteed benefit is not a benefit, new or net. Now, the city puts all its eggs in section 22403, claiming it's not responsible for the pension benefits that the pension funds themselves there. And they say that creates a default rule for which pension system members have no recourse. But that argument ignores the pension protection clause. It absolutely guarantees payment of constitutionally promised pension benefits. And as this court recognized, the pension clause is designed to force the funding of pensions indirectly by putting the state and municipal governments on notice that they are responsible for those benefits, however they choose to fund them. Even the laborers fund does not endorse the city's view of section 22403. It's important to remember 22403 predates the constitution. Not every section of the pension code is part of the pension contract that the clause describes. And to the extent that 22403 could be read as the city does, it simply is unconstitutional and void in light of the clause, including the transition schedule 9 that was included in the constitution. The cases to which the city refers, Kerner and DeFalco, those talk about individual qualifications for pension benefits. Those cases in no manner address funding for the pension obligations or the absolute guarantee that those pension obligations have to be paid. That disposes of the net benefit theory, Your Honors. So I'll spend my remaining few minutes on the city's theory that somehow or another this was a bargain for exchange. That alternative is no better. Even if the city's facts were taken as true, there was no exchange, no consideration, and no bargain. As the city admits, the court has recognized, these are individual benefits. These are individual rights, but as I said, no pension system member was present at any city negotiations. Now, the city contends that it can't collectively bargain pension diminishments. And so it's come up with this creative 11th hour theory. Yet the city offers not a single fact that union representatives who attended the negotiations that the city describes were somehow, through some other mechanism, representing their members, much less retirees. The New York cases to which the city referred are inapplicable here. Those cases involve collective bargaining. There was no collective bargaining in this case. Regardless, as the record shows, the unions who are plaintiffs in this case opposed the city's pension reduction concepts. And when the legislation was introduced, they opposed the legislation itself. No union submitted a slip in support of that. Even the SEIU who submitted an affidavit on behalf of the city took no position on the legislation as introduced. So how can that comport with any notion of an agreement? In the end, this so-called agreement fails for two additional reasons. First, defendants concede that the legislation materially changed after it was introduced at the insistence of the government. The pension stabilization levy that was designed to fund the increases in employer contributions to the fund was removed from the act because the governor didn't want it. Second, as I stated, there was no consideration for the diminishments. Putting aside money for a constitutionally guaranteed benefit is not a benefit. Simply, there was no bargain, no consideration, no exchange to do what the pension protection clause precludes in the first place. Defendants contend that the act will remove uncertainty. But that's precisely what the pension protection clause already does. This court should remind defendants of that certainty by affirming the circuit court's ruling that the act is unconstitutional and void in its entirety. Thank you. Unless there are questions, I will cede the remaining time to Mr. Krisloff. Good morning, Madam Chief Justice, and please the court. I'm Clint Krisloff on behalf of the Johnson plaintiffs, participants in both the Municipal Fund and the Laborers Fund. This is the same case as Heaton, only on a, rather than a state, federal basis. It deals with the city participants. Same issues, same arguments, same result. The argument that the city makes, the net benefit theory, is just a rejiggering of the police powers argument, which was rejected in Heaton. And it is that we have not bothered to fund these, and so the sky is about to fall, and so we can change everything. We can exercise our police powers. That was rejected. The argument is now, we haven't funded these, we have allowed them to get to the point of maybe insolvency in the next ten years, and because of what we've done, the sky is falling, and we're going to give you a net benefit in that we've created a situation that you won't have, that the guaranteed benefits are not guaranteed. Might not be paid, so here's what we're going to do, we're going to add, we're going to now say, here's how we're going to fund it, but you have to reduce your benefits. That was precisely the reason that Article 13, Section 5 was passed, was enacted by the people of the state of Illinois, to ensure that benefits, as they were provided, would be paid. You want to fund them, you don't want to fund them, somebody's going to pay this. And the city's argument is, well, we've satisfied all the statutory obligations that we have. And the fact is that's not entirely true, unless you put in the footnotes that especially with the laborers fund, for six years when the city decided that it didn't want to contribute, it got legislation passed in Springfield that freed it from making any contribution at all for, I believe, the years 2000 through 2000. And that was passed in 2006. At the same time, participants did not get such a pass. Participants had withheld from their paychecks the same contributions that they had made. They were still paying for a benefit that the city chose not to. This isn't, and the city argues, well, we have lots of unions who agreed with us, and, you know, this isn't a tag team match. I have no doubt that the city can enlist all sorts of people to support it in its position. But the fact is, there is no agreement that the city has ever tendered, you know, like a signed contract, doesn't exist. They didn't offer it. Number two, the unions are not authorized to represent retirees. They're not legally permitted to do that. And, indeed, the city, as it points to in the collective bargaining statute, would be precluded from putting as a collective bargaining issue the benefits that the participants get from another statute. That's what we're talking about. And the city really concedes, we couldn't do this by a collective bargaining agreement anyway. And so rather than afford the participants due process, which, you know, I've spent my life doing class actions, but the fundamental basis for class actions is that people are represented. They have the opportunity, if there was a settlement, they have the opportunity to have notice and an opportunity to be heard on the settlement. Here, what the city is saying, well, we couldn't do it by a collective bargaining agreement, and we didn't really fund it. We're not going to do this on an individual basis. It would be impossible. So we're just going to do this by a tag team deal where we get a bunch of people to sign on as some sort of rump group that we went down to Springfield and we got it done, and that should satisfy because, you know, it's like an all-you-can-eat restaurant where the restaurant owner comes out and says, that's all you can eat. The fundamental due process rights of participants needs to be protected. The Sklodowsky case, I know, it was our case, and it basically said we are not going to enforce what were specific obligations to contribute until and unless the funds are insolvent and unable to pay. Well, for the past 10 years, the funds, trustees who come out and say that they have to protect all the participants, where have they been? They had the right to go to court. They had the right for their funds to say, there's a problem here and you, the city, need to deal with it. There's a problem and you, the legislature, have to deal with it. They cannot just come in at the end and say, well, we didn't do anything all these years because we didn't have to, and so we're going to support the city's cutting the benefits to participants. That's not how Article 13, Section 5 works. I believe I've covered most of the points, and I believe between us we've covered it. Unless the court has any questions, we believe the decision below was right and we ask that it be approved. Thank you, counsel. May it please the court. I want to start by answering two questions this court raised. I want to go back, Justice Thomas, to your question, which I think I misunderstood during my argument because I thought you were asking about our consideration-based argument. But I think that what you're really asking had a premise that I disagree, and that is, plain language of the statute reduces benefits, but I think that the question is, why isn't that the end of the story here? In all due respect, I think that begs the question. The issue here is whether an act that overwhelmingly benefits participants and includes a substantial new actuarial funding obligation, but also reduces the future increase in automatic annual adjustment, diminishes or impairs the benefits of the membership of the funds in violation of the clause. What's the overwhelming benefit? The overwhelming benefit is that billions of dollars are going to be paid in these funds to be available to pay benefits when they become due. That's the overwhelming benefit, and that is backed up by two new enforcement mechanisms. Is it an overwhelming benefit based on the practicalities of where the fund is today? And aren't we comparing that overwhelming benefit, as you articulated, to what would seem to be an overwhelming benefit in the Constitution that says the pension funds can't be diminished or impaired? All due respect, no. And here's why. The benefit-first of all, plaintiff's argument proceeds from a false assumption that there was some obligation for the legislature to fund these funds. And again, as I said earlier, this Court's funding cases and the constitutional debates make that clear. What the pension clause says is you get the benefit of the bargain that was there when you joined, when you were hired. And here, the terms of that pension contract included a provision that specifically said only the funds themselves are obligated to be funded to pay pension benefits. So it starts from a false assumption. So is this a reality, Your Honor? So are you saying that by nature of the contract that was entered into when the city employee began work, they should have known that their pension benefits may not be there for them in the future? That that's the contract that they entered into? They entered into a contract, I'd say it a little differently, Your Honor. And, you know, fact of the matter is, the funding mechanisms that the legislature chose were completely adequate until about eight or ten years ago. In fact, one of these funds was 133 percent, it was overfunded, which is, by the way, the pension code specifically provided when it was overfunded. Contributions were required, were not required, and that's what Mr. Krisloff was referring to. But, yes, I am saying that under a whole long line of basic jurisprudence in this Court of cases, this Court has held time and time again that what the pension clause protects are the terms of that, and they may vary by fund. And they did here because the pension contract here, in many respects, was fundamentally different than those that were at issue in the SB1, in the SB2. Here, they were on notice, just as all participants and all parties were on notice that the terms of that contract included a provision 22403 that said the funds themselves were responsible, and them alone. Now, did they know that as it would turn out, that wouldn't be adequate, which is part of your question? No, they didn't. It was not a result of breach in the contract. It was just the way things turned out based on the terms of the contract that these folks had every right to and every expectation to. That's why this case does have to be looked at under its fact, but these are constitutional provisions that drive the result. We're not saying, well, in times of dire emergency or if you're on the verge of insolvency, all goes, you can take away rights. No, our argument is that what happened here is fundamentally inconsistent or consistent with the terms of the pension contract and the rights in this court's jurisprudence as to what this clause means and how it should be applied. Now, their only response to this. I hate to oversimplify it, but would you agree that the statute unquestionably means that they would be getting less than they were originally promised? No, it doesn't. It depends on the circumstances and what the General Assembly did in the interim. So the statute said you only get, the funds are only responsible for the obligation. In those over-intervening years, the General Assembly could have, but was not required to change that funding to make sure it was adequate. Now they did that, and in fact, we all agree that that's part of what the framers intended, to try to indirectly cause that kind of funding. What kind of an irony would it be if when the General Assembly stands up and does that, provides that funding that was never constitutionally guaranteed or required, that that statute becomes unconstitutional because there was some assumption that the money would be there when there's nothing in this jurisprudence that would make it unconstitutional. It says it has to be. Are you saying that there's nothing else that the General Assembly or the city could do to make sure that the funding was adequate outside of this provision? No, I'm not saying that, but I'm saying that that's not the legal issue before the court. We could speculate just in this case as in any damage case about all kinds of things that might eliminate harm or might fix a problem. The stark issue before this court, because this court's got a deal in facts and not speculation, it is a dichotomy. We know what the world is without the Act. There's no dispute about that. These funds are inadequately funded. They'll only get worse. They're liquidated 10% of their assets every year, and in 10 and 13 years at the latest they're going to run out of money, and from that point on pensioners will receive approximately 30% of what they have coming, or we have the Act. And the Act, again, it's undisputed, will not only save the funds. So to follow through, 10 to 13 years, so there's no money in there. Are the pensioners any less entitled to what they were promised? What they were promised was the terms of a bargain that had a limitation on who was... Let me put it this way. Would there be any recourse at that point short of agreeing with your argument in 10 to 13 years to make sure the participants get their money? Yes, and it's the only alternative that both in lower court and here anybody's come up with. Before you put at risk 61,000 participants' pensions, I would think you ought to have an alternative. We've been asking, what's your alternative? Before you throw these people under the bus and you take away something that guarantees their pensions, what is it? The only thing that they've ever come up with is the dicta from this Court's decisions in Sklodowski and McNamee that perhaps when funds are on, quote, the verge of default or imminent bankruptcy, then maybe they will have a direct action to make sure that they get their money. We heard today, Mr. Krislav couldn't say even who they'd sue or what the theory would be or how they would make a recovery. And my point, Your Honor, is even if you disagree with everything else I've said up to this point in time, everything, every question, disagree with what I've said. At the end of the day, these participants are still better off because they have a guaranteed source of funding, a pleasant, massive increase in what's going to be in the bank, earning investment returns to pay their pensions, a promise going forward that whatever that amount is, no more fixed schedule or X amount, your actuary's funds will calculate it, whatever it is that's due, that they're better off than this uncertain speculative lawsuit. They don't even know who to sue or what the theory will be maybe 10 or 13 years ago when the funds are on the verge of insolvency. So you're saying that the pension impairment is separate from the funding. Is that right? Well, it depends on the circumstances of the particular fund. What is protected by the clause are the benefits of membership in a retirement system. This court has repeatedly held to define what that contract is as protected, you look at the pension code, it's the legislature that defines what the terms of that relationship are. Whatever they are is protected. In many cases, most cases, there is a term in that contract that says who is responsible for backstopping it and under what circumstances. These funds didn't have that backstop, this act replaces it. Now the people that are saying this act would not be constitutionally protected are not us, and I want to address that because I think that was your question, Justice Tyson, I don't think you got an answer, it's them, and it's such a total role reversal. This actuarial funding commitment is and will be constitutionally protected for two reasons. Their argument to the contrary is undermined by the very funding cases they rely upon. And again, that is the Sklodowsky, Lindberg, and McNamee. Those cases illustrate the distinction between a funding schedule or legislative appropriations in a particular period of time, which is not constitutionally protected. That's what the framers said. And in a funding backstop, city, funds run out of money, you got to pay, each of those three cases had that kind of a backstop. Two of them also said how that backstop would work and said it would be actuarial funding obligation. This court didn't hold that was not constitutionally protected. What it held was not constitutionally protected was a failure to appropriate a particular level of funding in a particular year. Thank you, counsel, your time has expired. Very briefly, the threat to participants in retirement systems going forward in light of pension reform is not going to be because the General Assembly takes away benefits. The threat going forward is going to be that the money is not there to pay the pensions when they become due. The antidote to that is and has always been an actuarial funding obligation. That actuarial funding obligation exists for most of the state funds. If you sustain this act as I urge you to do, it will sustain here, that's a constitutionally protected right. And if you want to do something to further protect and to further move forward on protecting the rights of participants in this state's public pension plans, that's where you go. Overturn their view that that most fundamental right, a guarantee that what's been promised will be paid, is in fact constitutionally protected. That's what we ask you to do, that's what this case presents, is completely consistent with the rights of participants, in fact it's in their favor. Thank you so much for your time and attention today. I'm pleased to announce that Mr. Patton and Mr. Pennelly, Mr. Kennedy, Mr. Shapiro, and Mr. Kozloff, thank you very much for your arguments today. You're excused at this time.